UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| D.H., a minor, by his mother and next friend, Janel Jones<br><br>   Plaintiff,<br><br>  v.<br><br>MICHAEL J. ASTRUE, Commissioner of the Social Security Administration<br><br>   Defendants. | No. 10 C 913<br><br>Magistrate Judge Susan E. Cox |

## MEMORANDUM OPINION AND ORDER

Plaintiff, "DH," by his mother and next friend Janel Jones, brought this action to reverse or remand the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), who denied DH's claim for Child's Supplemental Security Income ("SSI"). DH now seeks summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Commissioner has filed a cross motion for summary judgment, requesting that this Court affirm his final decision. For the following reasons, DH's motion for summary judgment is granted [dkt. 21], and the Commissioner's motion for summary judgment is denied [dkt. 24].

## PROCEDURAL HISTORY

On July 19, 2005, Janel Jones protectively filed an application for Child's SSI payments on behalf of her son, DH.[1] Ms. Jones sought SSI on the basis of DH's learning disability.[2] That claim was denied on January 27, 2006.[3] Ms. Jones then filed a Request for Reconsideration and the claim

---

[1] R. at 52.
[2] R. at 47, 52.
[3] R. at 47.

was again denied by notice dated July 11, 2006.[4] On August 17, 2006, Ms. Jones requested a hearing before an Administrative Law Judge ("ALJ").[5]

On March 17, 2008, a hearing was held before ALJ E. James Gildea in Orland Park, Illinois.[6] Following the hearing, the ALJ issued an unfavorable opinion on November 20, 2008, finding that DH was not disabled under the Social Security Act.[7] Ms. Jones then filed a request for review of the ALJ's determination with the Social Security Administration's Appeals Council on December 19, 2008.[8] On December 15, 2009, the Appeals Council denied the request for review, making the ALJ's November 20, 2008 decision the final administrative determination of the Commissioner.[9] On February 10, 2010, Ms. Jones, on behalf DH, filed this action.[10]

## FACTUAL BACKGROUND

The evidence contained in the administrative record can be organized into three general categories: DH's school records, psychiatric and psychological reports, and testimony taken at the administrative hearing.

### A. DH's School Records

Some records documenting DH's school performance predate the application for disability benefits. Acknowledging that benefits for disability cannot be paid for periods prior to the application date,[11] DH provided this information for purposes of establishing his academic

---

[4]R. at 48.
[5]R. at 52.
[6]R. at 52, 64.
[7]R. at 52-64.
[8]R. at 7-8.
[9]R. at 1.
[10]Dkt. 1.
[11]20 C.F.R. §416.501; Pl's mt at 2.

background.

*1.    Pre-application school records*

School records date back to 2001, when DH was in grade school and it was determined that he had a learning disability.[12] DH was observed to be "struggling in all academic areas."[13] Specifically, attention and memory problems were noted.[14] To remedy the problems, DH was enrolled in special education classes and received speech and language therapy.[15] Despite DH's academic problems, it was observed that DH exhibited normal social skills.[16]

In the 2003-2004 school year, when DH was in the fifth grade, DH was observed to be improving in some areas.[17] He was on the wrestling team and ranked fifth in the state.[18] However, he still struggled in many academic areas, particularly in mathematics, and was two grade levels behind in most subjects.[19] It was observed that he had difficulty staying on task and would often distract other students.[20] Despite this, it was determined that DH was not at risk for Attention Deficit Hyperactivity Disorder ("ADHD").[21] While it was noted that he was generally a "friendly and polite boy", behavior and conduct problems were noted and it was observed that he became angry quickly.[22] He continued to receive special education and speech therapy and also received social work services for thirty minutes per week.

---

[12]R. at 301, 316.
[13]R. at 302.
[14]R. at 302, 312.
[15]R. at 228.
[16]R. at 304.
[17]R. at 154.
[18]*Id.*
[19]R. at 154, 261.
[20]R. at 154.
[21]*Id.*
[22]*Id.*

2. *Post-application school records*

During the 2005-2006 school year, when DH was in the seventh grade, he continued to struggle academically. In an Individualized Education Plan ("IEP"), which sets goals and monitors progress, it was noted that DH was progressing either poorly or fairly towards his objectives.[23] He also continued to perform well below his grade level in all subjects.[24] It was noted that he failed to consistently complete homework assignments and required frequent reminders to stay on task.[25] He was often tardy or absent.[26] DH continued to receive social work services and attend special education classes.[27] DH also had several disciplinary problems.[28] These problems culminated in an incident that occurred on October 14, 2005, when he physically and verbally assaulted a teacher.[29] These actions resulted in a ten-day suspension and 28 days incarceration in River Valley Juvenile Detention Center.[30]

By eighth grade, DH was reading at an "end 3rd/early 4th grade level."[31] His math skills were equivalent to the mid/end third grade level.[32] Writing skills were noted to be at an early fourth grade to fifth grade level.[33] His oral reading skills were representative of the fifth to sixth grade level.[34] It was again noted that DH demonstrated poor task completion skills.[35] He also had poor

---

[23] R. at 149.
[24] R. at 158.
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] R. at 152.
[29] *Id.*
[30] R. at 28, 152.
[31] R. at 321.
[32] R. at 322.
[33] R. at 329, 345.
[34] R. at 345.
[35] R. at 323.

attending skills and struggled with peer interaction.[36] It was stated that he would "change from happy to angry in a split second" and demonstrated impulsivity.[37] He was further observed to have destroyed school property, have trouble answering truthfully about possible infractions, and generally not take responsibility for his actions.[38] While he would respond to redirection, he would usually quickly regress to become "uncooperative and sullen."[39] He lacked appropriate independence and therefore required frequent reminders to stay on task.[40] During the eighth grade, he continued to receive social work and special education services.[41]

DH continued to attend special education classes in high school, but speech and language services were discontinued in January 2007.[42] However, his academic performance remained well below his peers.[43] DH continued to demonstrate poor impulse control and had difficulty staying on task.[44] He failed to complete homework in a consistent manner.[45] The grades reported on his November 2007 IEP were as follows: three Fs; one C-minus; one D; and one B.[46] Multiple disciplinary problems were also reported, which resulted in three warnings and two in-school suspensions.[47] Finally, it was noted in the November 2007 IEP that his social worker contacted his mother twice regarding "suicidal ideation."[48]

---

[36] R. at 323, 332.
[37] R. at 326.
[38] *Id.*
[39] *Id.*
[40] R. at 327.
[41] R. at 337.
[42] R. at 354, 357.
[43] R. at 357.
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] R. at 373.
[48] R. at 357.

**B.      Psychiatric and Psychological Reports**

Following DH's incarceration in River Valley Juvenile Detention Center, which occurred as a result of the October 2005 verbal and physical assault of a teacher, psychological and psychiatric evaluations were conducted in October and November of 2005. First, a certified counselor filed a report on October 28, 2005, in which she made the following initial diagnoses: Anxiety disorder; enuresis; psychotic disorder; Post Traumatic Stress Disorder ("PTSD"); and nightmare disorder.[49] Second, in a report dated November 4, 2005, an examining psychologist, Andrew Blazsanyik, made the following diagnostic impressions: PTSD; child antisocial behavior; and bedwetting per youth.[50] Dr. Blazsanyik also administered cognitive testing and estimated DH's full scale IQ to be 83, which placed him in the thirteenth percentile.[51] Third, in a report dated November 5, 2005, an examining psychiatrist made the following provisional diagnostic impressions: PTSD; depressive disorder; ADHD; nocturnal enuresis; and childhood antisocial behaviors.[52]

On January 10, 2006, Psychologist William N. Hilger, Jr., Ph.D. completed a psychological testing report on behalf of the Social Security Administration.[53] Dr. Hilger met with DH and Ms. Jones, took a one-page statement from Ms. Jones, and administered cognitive testing, but he did not review any other records.[54] On an IQ test administered by Dr. Hilger, DH scored a full scale IQ of

---

[49]R. at 391-92.
[50]R. at 380-86.
[51]R. at 382.
[52]R. at 377-78.
[53]R. at 247-49.
[54]R. at 247-49.

64, which is the first percentile rank.[55] More specifically, DH's verbal comprehension tested in the 0.2 percentile, perceptual reasoning and working memory tested in the third percentile rank, and processing speed ranked in the twenty-seventh percentile.[56] However, Dr. Hilger noted that DH put forth a poor effort during the test and, therefore, the results likely "underestimate[d]. . . his true intellectual functioning. . ."[57] Dr. Hilger's diagnosis noted some malingering with suboptimal effort and an oppositional-defiant to under socialized conduct disorder.[58] Dr. Hilger further diagnosed DH with "learning disabilities in auditory-verbal abilities to likely the borderline slow learner range with at least average perceptual motor abilities and overall intelligence to the borderline and not mentally deficient range."[59]

In addition to Dr. Hilger's independent review, the Social Security Administration had two additional doctors review DH's records and make a finding regarding DH's limitations. Jerrold Heinrich, Ph.D. submitted an opinion on January 25, 2006, finding that DH had a marked limitation in acquiring and using information.[60] On June 27, 2006, Kirk Boyenga, Ph.D. submitted a finding that DH had a marked limitation in caring for himself.[61] While both of these doctors had the benefit of Dr. Hilger's opinion, it appears that Dr. Heinrich did not have access to DH's school records, while Dr. Boyenga did have access to school records.[62]

C.  **Administrative Hearing Testimony**

---

[55] R. at 248.
[56] Id.
[57] R. at 249.
[58] Id.
[59] Id.
[60] R. at 250.
[61] R. at 296.
[62] See R. at 252, 296.

At the administrative hearing before the ALJ, DH and Ms. Jones testified. The ALJ and DH's attorney questioned DH about his school performance, friends, and disciplinary problems.[63] DH specifically testified that he was in special education classes for almost all of his subjects.[64] He claimed to have received mostly Cs and one B-plus on his last grade report.[65] DH stated that he generally turned in his homework when it was due, did not get in fights, had "a lot" of friends.[66] DH also testified that he was enrolled in an after-school program called "twenty-first century," which is a program for students who are failing classes to get extra help from teachers.[67] He said that he had difficulty staying on task and that mathematics is the subject in school that gives him the most trouble.[68] He further testified that he had trouble with his temper.[69]

Ms. Jones's testimony covered a variety of topics, ranging from DH's school performance to his medical history to his ability to maintain relationships.[70] Specifically, Ms. Jones disagreed with DH's testimony regarding his grades. Instead, she stated that in the last grade report, DH received three Fs, one C, one D, and two Bs. Ms. Jones did agree, however, that DH did not get into fights.[71] Ms. Jones further testified that she received several communications from DH's school stating that he was misbehaving in class, not staying on task, and failing to complete his assigned work.[72]

## SOCIAL SECURITY REGULATIONS

---

[63]R. at 13-26.
[64]R. at 14.
[65]R at 15.
[66]R. at 16, 17.
[67]R. at 18.
[68]R. at 19, 22.
[69]R. at 24-25.
[70]R. at 27-44.
[71]R. at 30.
[72]R. at 37.

When seeking a child's SSI, the claimant must demonstrate that he or she is disabled as defined by the Social Security Act and corresponding regulations. The Social Security Administration regulations require a sequential three-step analysis to determine whether a child is disabled.[73] First, the ALJ must determine if the claimant is engaging in a substantial gainful activity.[74] If not, the ALJ moves to the second step, which requires a determination as to whether the claimant has a medically determinable severe impairment or a combination of impairments that can be deemed severe.[75] If so, the ALJ moves to the third step, where the ALJ must determine whether the claimant has an impairment or combination of impairments that meets or medically equals the criteria of a listing in the regulations, or that functionally equals the listings in the regulations.[76] If so, the claimant is deemed disabled.[77]

In determining whether an impairment or combination of impairments functionally equals the listings, the ALJ analyzes the claimant's functioning in terms of six domains.[78] These six domains are (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being.[79] To be deemed functionally equivalent, the claimant's impairment must result in a marked limitation in two of the domains or an extreme limitation in one domain.[80] A marked limitation is an impairment that seriously interferes with the claimant's "ability to

---

[73] 20 C.F.R. § 416.924.
[74] 20 C.F.R. § 416.924(b).
[75] 20 C.F.R. § 416.924(c).
[76] 20 C.F.R. § 416.924(d).
[77] 20 C.F.R. § 416.924(d)(1).
[78] 20 C.F.R. § 416.926a.
[79] 20 C.F.R. §§ 416.926a(b)(1)(i)-(vi).
[80] 20 C.F.R. §§ 416.926a(d).

independently initiate, sustain or complete activities."[81] "'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.'"[82] An extreme limitation is an "impairment [that] interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities."[83]

## ALJ'S DECISION

In his November 20, 2008 decision, ALJ Gildea used the three step sequential analysis and determined that DH was not disabled within the meaning of the Social Security Act.[84] At step one, the ALJ found that DH had not engaged in any gainful activity that would disqualify his eligibility for benefits.[85] Moving to step two, the ALJ found that DH had a learning disorder and oppositional defiant disorder.[86] Applying the applicable regulations, the ALJ determined that DH had more than slight abnormalities and more than minimal functional limitations and, therefore, the impairment was deemed severe.[87] Moving to step three, the ALJ concluded that DH did not have an impairment or combination of impairments that met or medically equaled the requirements of the listings found in the regulations.[88]

The ALJ also determined that DH did not have an impairment or combination of impairments that functionally equaled the listings.[89] In making this finding, the ALJ examined each of the six domains and made a finding regarding DH's limitations.[90] First, he found that DH had less than a

---

[81] 20 C.F.R. § 416.926a(e)(2)(i).
[82] *Id.*
[83] 20 C.F.R. § 416.926a(e)(3)(i).
[84] R. at 52-64.
[85] R. at 55.
[86] *Id.*
[87] R. at 55-56; 20 C.F.R. §416.924(c).
[88] R. at 56-57; *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.
[89] R. at 57.
[90] R. at 59-64.

marked limitation in acquiring and using information.[91] In reaching this conclusion, the ALJ thoroughly defined the domain.[92] The ALJ then discussed some of the facts relating to DH and his ability to acquire and use information, predominantly Dr. Hilger's report.[93] Second, the ALJ found that DH had less than a marked limitation in attending and completing tasks.[94] Again, the ALJ gave a thorough explanation of the meaning of the domain as defined by the regulations.[95] However, only one sentence of analysis was devoted to this domain.[96] Third, the ALJ found that DH had less than a marked limitation in interacting and relating with others.[97] After another sufficient discussion of the regulations, the ALJ again provided a limited analysis for this domain.[98] Fourth, the ALJ found that DH had no limitation in moving about and manipulating objects.[99] Fifth, the ALJ found a marked limitation in the domain of caring for yourself.[100] Finally, sixth, no limitation was found with regard to health and physical well being.[101] Because only one marked limitation was found and no extreme limitations were found, the ALJ concluded that DH did not have an impairment that functionally equaled the listings and, therefore, he was found to be not disabled with the meaning of the Social Security Act.[102]

## STANDARD OF REVIEW

The Court performs a de novo review of the ALJ's conclusions of law, but the ALJ's factual

---

[91] R. at 59.
[92] *Id.*
[93] R. at 59-60.
[94] R. at 61.
[95] R. at 60-61.
[96] R. at 61.
[97] R. at 62.
[98] R. at 61-62.
[99] R. at 62.
[100] R. at 62-63.
[101] R. at 64.
[102] R. at 57-64.

determinations are entitled to deference.[103] The District Court will uphold the ALJ's decision if substantial evidence supports the findings of the decision and if the findings are free from legal error.[104] Where reasonable minds differ, it is for the ALJ, not this Court, to make the ultimate finding as to disability.[105] However, the ALJ must make an accurate and logical connection from the evidence to the ultimate conclusion.[106] While, the ALJ is not required to discuss every piece of evidence, the ALJ must minimally articulate his reasons for crediting or discrediting evidence of disability.[107]

## ANALYSIS

DH does not contend that he has an impairment or combination of impairments that meets or medically equals the requirements of the listings found in the regulations. Instead, DH raises objections with the manner in which the ALJ analyzed three of the six domains. DH does not seek review of the finding that he has no limitation in the domains of moving about and manipulating objects and health and physical well being. Further, DH also accepts the conclusion that he has a marked limitation in the domain of caring for himself. Therefore, we need to discuss only the three remaining domains: acquiring and using information, attending and completing tasks, and interacting and relating with others.

Specifically, DH raises two arguments before this Court. First, DH argues that the ALJ's finding that he had a less than a marked limitation in acquiring and using information is not supported by substantial evidence or logically explained based on the evidence. Second, DH

---

[103] *Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006).
[104] 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F. 3d 936, 940 (7th Cir. 2002).
[105] *Cass v. Shalala,* 8 F. 3d 552, 555 (7th Cir. 1993).
[106] *Dixon v. Massanori*, 270 F. 3d 1171, 1176 (7th Cir. 2001).
[107] *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

contends that the ALJ's rationale for finding less than a marked limitation in the domains of attending and completing tasks and interacting and relating with others is not logically explained based on the evidence and is not adequate to permit informed judicial review. We will consider each of these three domains separately.

**A.     Acquiring and Using Information**

The regulations define acquiring and using information as how well the claimant acquires or learns information and how well that information is used.[108] For an adolescent between the ages of 12 and 18, such as DH, the claimant "should continue to demonstrate what [he has] learned in academic assignments (e.g., composition, classroom discussion, and laboratory experiments)."[109] Further, the claimant should have the ability to use the information learned independently in daily living situations, such as using the library or public transportation.[110] The claimant "should be able to comprehend and express both simple and complex ideas, using increasingly complex language (vocabulary and grammar) in learning and daily living situations (e.g., to obtain and convey information and ideas)."[111] Finally, the claimant should also learn to apply these skills in a practical manner to help him enter the workplace.[112]

The ALJ found that DH had less than a marked limitation in this domain based primarily on the report of Dr. Hilger.[113] Specifically, the ALJ noted that DH could speak in a fluent and articulate manner, that his verbal intellectual abilities and overall intelligence were in the mild mental deficient

---

[108] 20 C.F.R. § 416.926a(g).
[109] 20 C.F.R. § 416.926a(g)(2)(v).
[110] *Id.*
[111] *Id.*
[112] *Id.*
[113] R. at 59-60.

range, that he demonstrated moderate deficits in conceptual reasoning and expressive word knowledge, and that he showed an average score in the area of visual concentration.[114] Further, he showed a mild deficit in visual-motor coordination, a marked deficit in matrix reasoning, and a moderate deficit in oral arithmetic ability.[115] The ALJ also briefly discussed that DH was behind in several subjects and that he was in special education classes.[116]

DH argues that there was not sufficient discussion of the other evidence in the record, particularly the school records. DH notes that school records continually report that he was performing well below his grade level in many subjects. Furthermore, DH points to Dr. Heinrich's opinion, which had determined DH had a marked limitation in this domain.

The Commissioner, however, maintains that reliance on Dr. Boyenga's opinion was warranted because Dr. Boyenga had all the school records as well as Dr. Hilger's report, while Dr. Heinrich did not have the school records. The Commissioner notes that while the ALJ did not expressly state his reasoning for relying on Dr. Boyenga's report over Dr. Heinrich's report, it is easy to determine his reasoning because the ALJ's analysis mirrored Dr. Boyenga's analysis. The Commissioner also maintains that DH fails to identify any evidence, other than Dr. Heinrich's report, that would compel a different finding from the ALJ's. Further, argues the Commissioner, any potential errors in the ALJ's opinion are harmless and do not warrant remand or reversal.

We cannot agree with the Commissioner in this regard, and find aspects of the ALJ's analysis in this domain that are deficient. The ALJ failed to explain why he did not credit portions of the

---

[114] *Id.*
[115] R. at 60.
[116] *Id.*

record that were favorable to DH, including school reports, which consistently showed DH was well behind his grade level and Dr. Heinrich's finding of a marked limitation in this domain.[117] While the Commissioner makes the argument that reliance on Dr. Boyenga's report over Dr. Heinrich's report was warranted, we simply do not have enough discussion in the ALJ's decision to know. While the ALJ generally references these opinions early in his decision, it is not clear that the ALJ considered either of those reports when making his determination regarding this domain. The ALJ heavily relies on Dr. Hilger's report; however, Dr. Heinrich also relied on this report and found a marked limitation in this domain.[118] Put simply, it is not clear to the Court that the ALJ based his determination on the conclusion of Dr. Boyenga.

We also do not agree that the error is harmless. As stated in *Steele v. Barnhart*, "regardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ."[119] Therefore, there is insufficient discussion of the evidence in this domain to permit the benefit of subsequent review.

**B.     Attending and Completing Tasks**

The regulations define attending and completing tasks as how well the claimant is able to focus and maintain his attention, and begin, carry through, and finish activities.[120] This includes the pace at which the claimant is able to complete activities and ease with which he changes them.[121] Adolescents "should be able to pay attention to increasingly longer presentations and discussions,

---

[117]*See Murphy v. Astrue*, 496 F. 3d 630, 634-35 (7th Cir. 2007).
[118]R. at 252.
[119]*Steele,* 290 F.3d at 941.
[120]20 C.F.R. § 416.926a(h).
[121]*Id.*

maintain [their] concentration while reading textbooks, and independently plan and complete long-range academic projects."[122] The claimant should be able to organize his materials and plan sufficient time to complete school assignments.[123] An adolescent should also be able to maintain his attention on a task for prolonged periods, "and not be unduly distracted by [his] peers or unduly distracting to them in a school or work setting."[124]

The ALJ found DH had less than a marked limitation in this domain as well, but it is not clear what he based this finding on.[125] All that is stated with regard to DH's capabilities in this domain is, "[h]e is capable of attending to task but does not always do so per school/home information."[126] This is the same statement that Dr. Boyenga made regarding this domain.[127]

DH complains that this is an insufficient discussion given that school records indicate "a pattern over time of problems attending and completing, with significant distraction of and by peers."[128] DH argues that the brief explanation by the ALJ is not sufficient to permit informed judicial review given this evidence. The Commissioner, however, maintains that the ALJ's decision sufficiently meets the standard, which requires only a minimal articulation. Further, the Commissioner argues that the ALJ explicitly relied on the Dr. Heinrich's and Dr. Boyenga's opinions, which found no limitation and less than a marked limitation, respectively. Additionally, the Commissioner argues that the ALJ noted DH's fifth place finish in wrestling, which shows his ability to focus.

---

[122] 20 C.F.R. § 416.926a(h)(2)(v).
[123] *Id.*
[124] *Id.*
[125] R. at 60-61.
[126] R. at 61.
[127] R. at 296.
[128] Pl's mtn at 13.

We cannot agree with the Commissioner that the ALJ's discussion here is sufficient. The law requires the ALJ to "build a logical bridge" from the evidence presented to the decision reached.[129] Further, there must be a minimal articulation that justifies the ALJ accepting or rejecting evidence of disability.[130] Here, there are several school records that indicate DH had trouble staying on task. It was also noted throughout DH's school records that he frequently distracted other students. Further, Dr. Hilger's opinion noted that DH got frustrated and gave up quickly. Nowhere in the ALJ's opinion is there a discussion of this evidence. The ALJ also does not state why this evidence would not rise to the level of a "marked" limitation. Further, despite the Commissioner's argument that the ALJ explicitly relied on Dr. Heinrich's and Dr. Boyenga's opinions, the ALJ does not make it clear that his reliance on these records was the reason for his final determination in this domain.

**C.     Interacting and Relating with Others**

In the regulations, interacting and relating with others is defined as how well the claimant initiates and sustains emotional connections with others, develops and uses the language of his community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others.[131] By adolescence, a child should be able initiate and begin friendships with children of the same age.[132] He should also be able to solve conflicts with peers, family members, and other adults.[133] An adolescent "should recognize that there are different social rules" for his friends than compared with adults.[134] Also, he

---

[129] *Dixon,* 270 F.3d at 1176 (citing Zurawski v. Halter, 245 F. 3d 881, 887 (7th Cir. 2001)).
[130] *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir.2004).
[131] 20 C.F.R. § 416.926a(i).
[132] 20 C.F.R. § 416.926a(i)(2)(v).
[133] *Id.*
[134] *Id.*

should be able to intelligibly express [his] feelings, ask for assistance in getting [his] needs met, seek information, describe events, and tell stories, in all kinds of environments (e.g., home, classroom, sports, extra-curricular activities, or part-time job), and with all types of people (e.g., parents, siblings, friends, classmates, teachers, employers, and strangers)."[135]

In finding that DH had less than a marked limitation in interacting and relating with others, the ALJ noted the incident of physical and verbal assault against the teacher.[136] He noted that DH has respect for the rules of the home, but broke them sometimes.[137] The ALJ also noted that DH has friends.[138] The ALJ further observed that DH is not skilled at avoiding arguments and does not respond appropriately to advice or criticism.[139] But the ALJ's statement is simply the exact same statement given by Dr. Boyenga regarding this domain.[140] There is no further analysis or explanation provided.

DH argues that the ALJ failed to articulate the grounds for his decision in a manner to permit informed judicial review. DH asserts that the logical bridge between the evidence and the conclusion is lacking. The Commissioner's counter argument is the same here as for the domain of attending and completing tasks: the discussion was sufficient and the ALJ explicitly relied on Dr. Heinrich's and Dr. Boyenga's opinions. Furthermore, the Commissioner points to the school records, which consistently state that DH is a "friendly and polite boy" and that he is able to follow the classroom routine.

In this domain, as well, we fail to see the required "bridge" from the evidence to the conclusion. Again, while only a minimal articulation is required, we do not believe in this

---

[135]*Id.*
[136]R. at 61-62.
[137]R. at 62.
[138]*Id.*
[139]*Id.*
[140]R. at 296.

circumstance that the ALJ has adequately explained how the evidence fails to reach the level of "marked."

## CONCLUSION

For the reasons explained above, DH's motion for summary judgment is granted [dkt. 21] and the Commissioner's motion for summary judgment is denied [dkt. 24]. We, therefore, remand the case to the Social Security Administration for further proceedings consistent with this opinion.

**IT IS SO ORDERED**.

**ENTERED: September 28, 2010**

**SUSAN E. COX**
United States Magistrate Judge